# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAMBERS JUNES,<br>Plaintiff,<br><br>v.<br><br>GOVERNMENT OF THE<br>DISTRICT OF COLUMBIA, et al.<br><br><br>Defendants. | Civil Action No: 17-85 (TFH) |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY

## JUDGMENT

O tempora, O mores!

Officer Onoja, a 35 year old policeman armed with a gun, Onoja depo, p. 109, a metal night stick, *Id.* at 110, and a can of pepper spray, *Id.*, and unlimited back up, attacks the broken down 50 year old Mr. Junes by spraying pepper spray in his face at point blank range and knocking him off his bike onto the pavement, and then he justifies the attack on the ground that Mr. Junes served his country in the Army. Defendants' SUMF ¶ 19 ("At deposition, Defendant Onoja testified that he considered the fact that Plaintiff was an army veteran to be significant because it meant that Plaintiff had military training, knowledge, fitness, and the ability to utilize tools and firearms.").

Instead of thanking Mr. Junes for his service, Officer Onoja uses it as a pretext to intentionally spray pepper spray in his eyes and knock him down. *Id.*

Mr. Junes is not Jason Bourne.



He's Mr. Bojangles.[1]

He drives his bike around the neighborhood he grew up in and he "drinks a bit." Junes depo, p. 63, 65.

But, even if Mr. Junes were the D.C. equivalent of Jason Bourne, and Mr. Junes were truly a dangerous man, why confront him alone in a lonely dark alley at night over a maybe/ might/ could be quality of life violation? That Officer Onoja leapt out of his car and approached Mr. Junes without calling for back up demonstrate that regardless of any training the 50 year old Mr. Junes had received Officer Onoja was not circumspect about approaching him alone in a dark alley. And even if Officer Onoja knew when he got out of his car in the dark alley that Mr. Junes had carried a knife for self defense, Onoja depo, p. 231, he also knew he had stopped him on two prior occasions and he had not felt unsafe, and that Mr. Junes had never brandished a weapon. *Id.* at 13-18.

## INTRODUCTION

Defendants' motion should be denied for the reasons stated below. By stipulation with the defendants Plaintiff Mr. Junes dismisses all claims against the District and no party will seek a judgment on those claims.

---

[1] Mr. Bojangles, by Jerry Jeff Walker. https://www.youtube.com/watch?v=cycD8SBS84I

In this case, Mr. Junes was riding his bike through the alley behind Bladensburg one night when he stopped to fix his gloves. BWC video, Defendants' Ex. D [22-4], 00:01 to 00:45. Officer Onoja came through in his cruiser and hit the brakes and leapt out of his car. *Id.*

He ultimately arrested Mr. Junes for four charges.

As a result of his arrest report the U.S. Attorney papered four charges:

- ➤ assault on a police officer ("APO"), D.C. Code § 22-405 (b);

- ➤ possession of prohibited weapon (switchblade) in violation of D.C. Code § 22–4514(a);

- ➤ possession of an open container of alcohol ("POCA") in violation of D.C. Code § 25–1001; and

- ➤ possession of a controlled substance (K-2), in violation of D.C. Code § 48–904.01(d).

Officer Onoja fabricated some or all of the facts underlying these charges including pumping them up to strengthen a weak case which caused the prosecutor to paper a weak case and which caused a stay-away preventing Mr. Junes from visiting his favorite places and socializing with his friends. Ps. Ex. # 3 (stay away); Ps. Ex. # 4 (transcript of arraignment where stay away was granted). The stay away covered Starburst Plaza even though the incident occurred two blocks away.

## I.   Mr. Junes' Fifth Amendment Fabrication Of Evidence Claim Against Officer Onoja Is A Stand-Alone Claim And It Does Not Merge With Any Fourth Amendment Claim.

Defendants treat this part of their motion as a motion for summary judgment because they rely on their statement of uncontroverted material facts.

Since this is a summary judgment motion, as non-movant, Mr. Junes' version of the facts must be credited, even if uncorroborated and "directly contradictory" to police testimony, and the Court must draw all reasonable inferences in favor of Mr. Junes as the nonmoving party. Robinson v. Pezzat, 818 F.3d 1, 8-9 (D.C. Cir. 2016) *citing* Tolan v. Cotton, 134 S. Ct. 1861, 1867 (2014).

Defendants contend that Mr. Junes' Fifth Amendment fabrication of evidence claim (that is, forwarding false evidence to the prosecutors knowing they will rely on it to make papering decisions) against Officer Onoja "merges" with his 4th Amendment claim. Fabrication of evidence claims – including providing a false version of the arrest narrative – violate the 5th Amendment. Napue v. Illinois, 360 U.S. at 269; Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004). They do not "merge" with false arrest claims or other claims arising out of the seizure.

The first problem with this argument is that Mr. Junes did not plead a 4th Amendment false arrest claim.

But, in any event, Mr. Junes' Fifth Amendment fabrication of evidence claim against Officer Onoja is a stand-alone claim which compensates Mr. Junes for the loss of liberty he suffered as a result of Officer Onoja's fabrication of evidence against him. In Garnett v. Undercover Officer C0039, the Second Circuit explained that even if police have probable cause to support an arrest without fabrication, the police can still use fabricated facts to pump up a weak claim, and those fabricated facts can cause an arrestee to suffer an additional deprivation of liberty such as more onerous conditions of relief, or even persuade the prosecutor to paper a case in the first place. 838 F.3d 265, 277 (2d Cir. Cir. 2016). In such a circumstance "merging" the Fifth Amendment fabrication of evidence claim into a 4th Amendment false arrest claim would leave an arrestee without a remedy for the further deprivation caused by the fabricated facts and it would effectively immunize the fabricating officer from liability. *Id.; see also*, Robinson v. City of Garland, Tex., 2016 U.S. Dist. LEXIS 43482, at *8 (N.D. Tex. Feb. 29, 2016) (Ramirez, Mag. J.) ("There

may be a due process violation . . . when police intentionally fabricate evidence, successfully get someone falsely charged, and relief under the Fourth Amendment is unavailable. The presence of probable cause does not forestall Plaintiff's options under the Fourteenth Amendment." (citations omitted)).

The Supreme Court has made clear in post <u>Graham</u> cases that even in the seizure context, ""[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands." <u>Soldal v. Cook County</u>, 506 U.S. 56, 70 (1992). As the Court explained in <u>Soldal</u>, in <u>Graham</u>, "both provisions targeted the same sort of governmental conduct and, as a result, we chose the more "explicit textual source of constitutional protection" over the "more generalized notion of 'substantive due process.'" <u>Soldal</u>, 506 U.S. at 70.

Officer Onoja's fabricating of evidence violated two Constitutional rights and in this case Mr. Junes chose the 5th Amendment remedy because even if the Court finds probable cause on one or all of the charges by pumping up the charges with fabricated facts Officer Onoja caused an additional deprivation of Mr. Junes' liberty – papering a weak case in the first place and imposition of a stay that kept Mr. Junes from socializing in his own neighborhood with his life log friends. Ps. Ex. # 3 (stay away); Ps. Ex. # 3 (stay away); Ps. Ex. # 4 (transcript of arraignment where stay away was granted). The stay away covered Starburst Plaza even though the incident occurred two blocks away.

### A.  Officer Onoja papered this case and caused Mr. Junes to be charged and subjected to conditions of release.

Officer Onoja typed up the arrest packet in Cobalt as the reporting officer, defendants' Ex. C [22-3], p. 4 (signature line) and he transmitted it to the prosecutor in "paperless papering" knowing the prosecutor would rely on his statement of facts to make their papering decisions.

Onoja depo, p. 218-219. See General Order 701.03 (Handling Assaults on Police Officers), effective September 29, 2010. https://go.mpdconline.com/GO/PCA_701_03.pdf.

As a result of his papering the U.S. Attorney papered four charges:

➢ assault on a police officer ("APO"), D.C. Code § 22-405 (b);

➢ possession of prohibited weapon (switchblade) in violation of D.C. Code § 22–4514(a);

➢ possession of an open container of alcohol ("POCA") in violation of D.C. Code § 25–1001; and

➢ possession of a controlled substance (K-2), in violation of D.C. Code § 48–904.01(d).

And, as a result of his papering the U.S. Attorney initiated a prosecution on those four charges, and sought and obtained a stay away, and pursued the prosecution for four months on those before deciding to *nolle prosequi* the charges. During that time Mr. Junes was subject to conditions of release including a stay away from his favorite places to hang out and socialize. Ps. Ex. # 3 (stay away); Ps. Ex. # 4 (transcript of arraignment where stay away was granted). The stay away covered Starburst Plaza even though the incident occurred two blocks away.

### 1. Facts manufactured by Officer Onoja.

In the Complaint [1] Mr. Junes pled that Officer Onoja falsely swore out a police report and a Gerstein (sworn probable cause affidavit) that Mr. Junes "swung his hand toward Officer Onoja'[s] direction in an attempt to strike Officer Onoja." Complaint ¶ 95.

Investigation and discovery revealed other facts that support the claim that Officer Onoja forwarded false evidence to the prosecutor which caused the prosecutor to initiate and pursue a prosecution against Mr. Junes for four months, during which time his liberty was impaired due to conditions of release and a stay away. Ps. Ex. # 3 (stay away); Ps. Ex. # 4 (transcript of arraignment

where stay away was granted). The stay away covered Starburst Plaza even though the incident occurred two blocks away.

Moreover, investigation and discovery revealed other facts that support the claim that Officer Onoja forwarded false evidence to the prosecutor which caused the prosecutor to initiate and pursue a prosecution against Mr. Junes on three other charges, possession of prohibited weapon (switchblade), D.C. Code § 22–4514(a), possession of an open container of alcohol, D.C. Code § 25–1001, and possession of a controlled substance (K-2), D.C. Code § 48–904.01(d), which caused the prosecutor to initiate and pursue a prosecution against Mr. Junes for four months, during which time his liberty was impaired due to conditions of release and a stay away.

The Complaint gave the defendants notice of the claims against them because it put defendants on notice that Mr. Junes was contending Officer Onoja fabricated facts in arrest report. Johnson v. City of Shelby, 574 U.S. –, 135 S. Ct. 346, 190 L. Ed. 2d 309, 310 (2014) (per curiam); Brown v. Sessoms, 774 F.3d 1016, 1022 (2014).

### a)   Officer Onoja's fabrications regarding assault on a police officer.

Mr. Junes testified in his deposition that he did not assault Officer Onoja, Junes depo, p. 128, or attempt to swing at him, *Id.* at 129. The BWC video shows the same. Defendants' Ex. D, 00:00 to 01:30.

In the Complaint [1] Mr. Junes pled that Officer Onoja falsely swore out a police report and a Gerstein (sworn probable cause affidavit) that Mr. Junes "swung his hand toward Officer Onoja'[s] direction in an attempt to strike Officer Onoja." Complaint ¶ 95.

In his narrative in the police report, defendant's Ex C [22-3], p. 3, Officer Onoja swore, "Officer reached to touch D-1s right arm to get D-1's attention to stop, D-1 swung his hand toward officer Onoja's direction in an attempt to strike officer Onoja but missed his target."

But, the only fact Officer Onoja states in his SMF in support of probable cause or establishing the elements of the APO charge is that "Defendant Onoja believed that Plaintiff made a striking motion towards him." Id. at 120:13-121:13."

And when he described the events to other officers on the scene he used even milder language, saying only that Mr. Junes "swatted" at him. *See e.g.,* Defendants' Ex. D, BWC video at 11:43, and *passim.*

Moreover, Officer Onoja concocted out of thin air the narrative that he had reason to fear Mr. Junes because of his military training. Although Officer Onoja recounted the incident for several officers on the scene immediately after the incident, he never once said that he was afraid when he encountered Mr. Junes let alone that he was afraid because Mr. Junes carried a knife or had army training, or that he pepper-sprayed Mr. Junes because of an "assault." Defendants' Ex. D, BWC video, *passim.*

Officer Onoja testified that he does not remember talking to the prosecutor, so nothing in the record suggests Officer Onoja ever provided the context of the incident to the prosecutor or that he ever explained that he merely "believed" that Mr. Junes "believed that Plaintiff made a striking motion towards him." Moreover, he did not testify that he produced the BWC video to the prosecutor.

So Officer Onoja both "pumped" up the basis of his APO charge against Mr. Junes by exaggerating Mr. Junes' conduct, and he also omitted key facts relevant to the elements of the offense. The assertion in the SMF is a much weaker assertion than he made in his police report because he omits the "intent" assertion and he downgrades the assertion from an objective statement of fact to a subjective statement of belief. Moreover, in his arrest report he replaces "swat" with "swung his hand toward officer Onoja's direction in an attempt to strike officer Onoja."

Furthermore, Officer Onoja omitted from the arrest report the context of the incident which explains and justifies Mr. Junes' conduct. The first words in the then effective APO statute were, "Whoever without justifiable and excusable cause." D.C. Code § 22-405 (b); Ruffin v. United States, 76 A.3d 845, 849 (D.C. 2013). So the context of the incident was crucial, and by the terms of the statute Officer Onoja had a duty to report the context in this case because the context negatived elements of the charge.

Officer Onoja omitted from his narrative in the police report that he was chasing Mr. Junes as Mr. Junes was pushing a bicycle and that Officer Onoja was spraying motion for summary judgment in the face with pepper spray when Mr. Junes "swung his hand." Video, 1:25. These facts were critical to evaluating whether Officer Onoja made out the elements of APO because they were crucial to evaluating whether Mr. Junes' conduct was "justifiable and [with] excusable cause."

Officer Onoja also omitted from his police report his recently expressed "fears" that Mr. Junes possessed amazing powers of fighting by virtue of his military training.

Second, the facts as captured on the video and as explained by Mr. Junes and Officer Onoja in his SMF do not satisfy the elements of APO even for probable cause because the probable cause test is objective under federal law and although the District of Columbia common law privilege has a good faith component for both assault and false arrest the officer's conduct must be objectively reasonable.

The "District's APO statute does not criminalize every refusal to submit to a police officer or every prevention or hindrance of an officer in his duties." Ruffin v. United States, 76 A.3d 845, 850 (D.C. 2013). To constitute "resisting" a police officer, "a person's conduct must go beyond speech and mere passive resistance or avoidance..." Id.

The version of the APO statute in effect at that time provided that for an individual's conduct to constitute "resistance" under the APO statute, it must be "active confrontation,

obstruction or other action directed against an officer's performance in the line of duty" rather than "mere passive resistance or avoidance." *Id.* (emphasis added) (citation and internal quotation marks omitted). Ruffin, 76 A.3d at 851 n.9. Also, the person had to be resisting *arrest*; resisting a grab or a Terry stop or some lesser form of detention was not APO. *Id.* And the person had to know the officer was acting "**in the line of duty**." *Id.* Running away from an officer is not resisting arrest. Coghill v. United States, 982 A.2d 802, 807 (D.C. 2009). Finally, a reflex action does not rise to the level of resisting to sustain an assault conviction. Ruffin, 76 A.3d at 851, n.9. An accidental touching of the person of another does not constitute an assault. Carter v. United States, 531 A.2d 956, 959 n.6 (D.C. 1987).

An officer forwards false evidence to the prosecutor both when they omit relevant evidence, and when they forward fabricated testify. The claim covers sins of omission, as well as sins of commission.

Even though the District of Columbia common law privilege is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation. Scales v. District of Columbia, 973 A.2d 722, 730 (D.C. 2009).

### b) Officer Onoja's fabrications regarding POCA.

The elements of POCA are: (1) possessing (2) an open can of alcohol, in this case, beer, containing more than one-half of 1% of alcohol by volume; (3) in an area prohibited by the statute. Campbell v. United States, 163 A.3d 790 (D.C. 2017). Probable cause to arrest requires the arresting officer to show at least some evidence supporting each element of the offense. Hall v. District of Columbia, 867 F.3d 138 (D.C. Cir. 2017). The default position in a in a false arrest case when defendant shows that he was arrested without a warrant is a rebuttable presumption that the

arrest was unlawful, and the burden shifts to the defendant to justify the arrest by showing that it was based on probable cause. Karriem v. District of Columbia, 717 A.2d 317, 320 (D.C. 1998). Officer Onoja did not have probable cause on the fundamental element, whether the Gatorade bottle held alcohol.

This charge was significant because it provided the basis for the initial stop and led to all the other charges. Officer Onoja fabricated probable cause facts which justified the stop of Mr. Junes.

First, Officer Onoja swore in his arrest report (Defendants' Ex. C [22-3]) and in his Gerstein that he knew there was beer in the Gatorade bottle on Mr. Junes' bike-holder because [he swore] that earlier in the day he had seen Mr. Junes with the selfsame Gatorade bottle in front of Rose's Liquor and somehow he had discovered it had alcohol in it, and he had made Mr. Junes pour it out. Exhibit C, p. 3 [22-3]. But, Officer Onoja himself abandoned the Gatorade bottle story in his deposition. Onoja depo, p. 101; Ps. Ex. # 1 (Gerstein). In his deposition he testified that earlier that day he saw Mr. Junes in front of Rose's drinking beer out of a beer *can* and he made him pour it out. *Id.* In this version, he did encounter Mr. Junes but he pumped up the probable cause facts by changing beer can to Gatorade bottle. At any rate, whether Officer Onoja encountered Mr. Johnson earlier in the day is a question for the jury because Mr. Junes denies encountering Officer Onoja earlier that day. Junes depo, p. 81; 11-16. Moreover, in the interview with Detective Justin T. Marlow immediately after the incident, Mr. Junes never mentions seeing Officer Onoja earlier in the day. Ps. Ex. # 2 *passim*.

Moreover, as pointed out above, although Officer Onoja activated his BWC during the encounter with Mr. Junes in the alley, there is no BWC footage for the encounter at Rose's that Officer Onoja fabricated in his arrest narrative and in his Gerstein. Given his duty to activate the BWC during stops, the absence of the BWC from the alleged Rose's stop (whether because

Officer Onoja never activated the BWC, or because he did not produce the BWC) creates an adverse inference against defendants that the Rose's stop did not occur.

### c) Officer Onoja's fabrications regarding possession of K-2.

Next, Officer Onoja swore that Mr. Junes possessed "rolled weed-like substance (K 2)."

K-2 is a chemical compounds dissolved in solvents, such as acetone, which are then applied to dry plant material to make K-2. DRUGS OF ABUSE I A DEA Resource Guide: 2017 EDITION, p. 88. https://www.dea.gov/pr/multimedia-library/publications/drug_of_abuse.pdf#page=88 K-2 is only detectable after chemical analysis. *Id.*

As of February 24, 2015, D.C. Code § 48–904.01(a)(1A)  allows personal possession of up to two oz. of marijuana by an adult, by excluding from the definition of "controlled substance" 2 ounces or less of marijuana.[2] So, possession of personal use marijuana was already legal on January 13, 2016, the date of the incident. But, "K-2" was not legal because it is not excluded from the definition of "controlled substance".[3] By classifying the "rolled weed-like substance" as "(K 2)" on the arrest packet documents Officer Onoja caused the prosecutor to initiate and pursue a prosecution against Mr. Junes for an illegal controlled substance under D.C. Code § 48–904.01(d). Ps. Ex. # 2 (Information, Junes depo. exhibit 3).

The burden is on defendants to establish by expert opinion that the substance was K-2 and not marijuana. The defendants failed to carry this burden so there is no evidence that the substance was K-2 and not marijuana. The only facts the prosecutor had to go on in making the charges was Officer Onoja's unsubstantiated assertion that the "rolled weed-like substance" was (K 2)." Officer Onoja did not even reference a field test to detect the presence of K-2.

---

[2] https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/I-71-FAQ.pdf
[3] https://www.drugabuse.gov/publications/drugfacts/synthetic-cannabinoids-k2spice

Mr. Junes did not testify that he possessed a synthetic cannabinoid when he was arrested only that he did not remember but that he "might have." Junes depo, p. 123. He was never asked whether he possessed K-2 that night. *Id.* He did not use any K2 in the twenty-four hours leading up to his arrest. *Id.* Construing all reasonable inferences in favor of Mr. Junes and against defendants Mr. Junes did not possess K-2. *See* Robinson v. Pezzat, 818 F.3d 1, 8-9 (D.C. Cir. 2016) *citing* Tolan v. Cotton, 134 S. Ct. 1861, 1867 (2014)(Court must credit the plaintiff's version of events, even if uncorroborated and "directly contradictory" to police testimony, and the Court must draw all reasonable inferences in favor of the plaintiff as the nonmoving party).

### d) Officer Onoja's fabrications regarding switchblade knife.

Officer Onoja provided to the prosecutor an arrest report that states that Mr. Junes possessed a "Spring loaded switch blade." He does not describe the knife as having brass knuckles. As a result, the prosecutor charged Mr. Junes with possession of prohibited weapon in violation of D.C. Code § 22-4514(a), possession of a switchblade knife. Defendants' exhibit C [22-3], p 22 (Information).

The defining feature of a switch blade knife is that it has a blade which opens automatically by means of a "spring loaded" mechanism operated by pushing a button or other device in the handle of the knife. Article: Knives And The Second Amendment, 47 U. Mich. J.L. Reform 167, 174 (2013); Peay v. United States, 575 A.2d 279, 285 n.4 (D.C. 1990)(dissent) ("a pocketknife having the blade spring-operated so that pressure on a release catch causes it to fly open") *vacated and reversed other grounds by* Peay v. United States, 575 A.2d 279, 282 (D.C. 1990)(*en banc*). Of the knives listed in §§ 22-3204 and 22-3214, only the possession of a switchblade is a strict liability offense; that is, it requires no intent. All other knives described in the two statutes require

possession with intent to use unlawfully against another. <u>Peay v. United States</u>, 575 A.2d 279, 282 (D.C. 1990).

Defendants did not produce a picture of the knife that Officer Onoja found either in discovery or in support of their motion. Officer Onoja references a knife or knives in his deposition several times when he states he believes Mr. Junes carries a knife but he never describes it as a switchblade. Neither switchblade nor knuckles is used in his deposition.

Mr. Junes conceded that he had a knife which he bought from "the hardware store." Tr. 118. He calls it a switchblade.

But, defendants' counsel questioned Mr. Junes about the details of his knife but there was no testimony indicating that it had a spring-operated automatically opening blade. Junes depo, p. 121-22. Moreover, he testified that the knife he had had been confiscated and returned by an MPD officer, Tr. 121, which indicates that it was not a "switchblade" in the sense of a knife having the blade spring-operated so that pressure on a release catch causes it to fly open, or a knife having the type of "knuckles" prohibited by D.C. Code § 22-4514(a).

Again, the record suggests that Officer Onoja exaggerated the type of knife he contends Mr. Junes possessed to make the charge a stronger, strict liability defense that did not depend on intent or use.

### B. The District's "merger theory" is inapplicable in this context because the conduct involved in the two claims is a different "sort of governmental conduct."

The District bases its "merger" theory" on language in <u>Matthews v. D.C.</u>, "Where a section 1983 claim alleging police misconduct 'arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, ... rather than under a 'substantive due process' approach.'" 730 F. Supp. 2d 33, 36

(D.D.C. 2010) *relying on* Graham v. Connor, 490 U.S. 386, 394 (1989). But, the reliance is misplaced because Matthews is distinguishable from the case on both the law and the facts.

First, the real issue in Mathews was whether the 5th Amendment provided a separate, independent basis for the 4th Amendment detention and strip-search claim. 730 F. Supp. 2d at 36. This is not a merger issue.

Harvey v. Kasco, which relied on Mathews, and on Cnty. of Sacramento v. Lewis, 523 U.S. 833, 843 (1998) instead of Graham, is distinguishable for the same reason. 109 F. Supp. 3d 173, 177 (D.D.C. 2015). In Kasco the Court wrote that "A plaintiff may not make a substantive due process claim for police misconduct when his claim "is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment[.]"Kasco, 109 F. Supp. 3d at 177.

Neither case dealt with fabricated evidence.

Moreover, the Supreme Court expressly rejected the reasoning of both Mathews and Kasco in Soldal v. Cook County, 506 U.S. 56, 70 (1992). In Soldal, by virtue of a sheriff's action, the Soldals' mobile home was not only seized, it literally was carried away. Soldal, 506 U.S. at 61. The Soldals sued for the seizure under the 4th Amendment. The 7th Circuit held that the Soldals' claim was more akin to a challenge against the deprivation of property without due process of law than against an unreasonable seizure, and the court concluded that they should not be allowed to bring their suit under the guise of the Fourth Amendment.

The Supreme Court disagreed, stating that even in the seizure context, ""[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands." Soldal, 506 U.S. at 70. As the Court explained in Soldal, in Graham, "both provisions targeted the same sort of governmental conduct and, as a result, we chose the more "explicit textual source of constitutional protection" over the "more generalized notion of 'substantive due process.'" Soldal, 506 U.S. at 70.

Similarly, the conduct involved in the fabrication of evidence claim - forwarding false evidence to the prosecutor – is a different "sort of governmental conduct" from the conduct involved in the arrest without probable cause.

As explained below, a further deprivation of liberty can result from the fabrication of evidence even if the initial arrest is based on probable cause. For example, a police officer can use fabricated evidence to strengthen a weak case, as Officer Onoja did here, resulting in more onerous conditions of release and in tipping the balance in favor of prosecution as the prosecutor weighs whether to paper a case. Garnett v. Undercover Officer C0039, 838 F.3d 265, 277 (2d Cir. 2016). Thus, the post-arrest fabrication of evidence can cause deprivations of liberty that go beyond the scope of a 4th Amendment claim. *Id.*

 Moreover, the misconduct on which this claim depends - forwarding false evidence to the prosecutor – did not arise in the seizure of Mr. Junes.

First, Officer Onoja arrested Mr. Junes without probable cause and then he pepper-sprayed him without justification. Subsequently, realizing his misconduct could get him in trouble, he started pumping up the facts of the seizure to make his conduct seems more reasonable – the 50 year old Mr. Junes became a trained killer, Officer Onoja knew the Gatorade bottle had alcohol in it because he had seen Mr. Junes drinking beer out of it earlier in the day, a little bit of weed became the dangerous synthetic cannabinoid K-2, an OTF (out the front) knife carried for self-defense consistent with the 2d Amendment became a dangerous switchblade.

Then, Officer Onoja wrote up the arrest packet charging these pumped up charges fortified with manufactured probable cause facts and transmitted them along with the arrest packet to the prosecutor in "paperless papering" knowing the prosecutor would rely on his statement of probable cause to make their papering decision. Onoja depo, p. 218-219. See General Order

701.03 (Handling Assaults on Police Officers), effective September 29, 2010.

https://go.mpdconline.com/GO/PCA_701_03.pdf.

### C.  Mr. Hall's fabrication claim is properly based on the 5th Amendment.

Mr. Hall's fabrication claim is properly based on the 5th Amendment as the cases cited below establish that courts uniformly hold fabrication of evidence claims can stand as an independent violation of the Fifth Amendment. *See e.g.*, Napue v. Illinois, 360 U.S. 264, 269 (1959). Moreover, the Due Process Clause of the Fourteenth Amendment provides the right to be free from false accusations made by state actors. These violations are independent from a Fourth Amendment malicious prosecution claim. Finally, the majority view is that the right to be free from fabrication of evidence by state actors does not require a conviction to constitute a violation.

### 1.  Courts uniformly hold that stand-alone claims for fabrication of evidence – including providing a false version of the arrest narrative – violate the 5th Amendment.

Courts uniformly hold that fabrication of evidence claims – including providing a false version of the arrest narrative – violate the 5th Amendment. Napue v. Illinois, 360 U.S. at 269; Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004); Coggins v. Buonora, 776 F.3d 108, 113-14 (2d Cir. 2015); Ricciuti v. NYC Transit Authority, 124 F.3d 123, 130 (2d Cir. 1997); Black v. Montgomery Cnty., 835 F.3d 358, 371 (3d Cir. 2016); Cole v. Carson, 802 F.3d 752 (5th Cir. 2015) *pet. cert. granted, judgment vacated, case remanded, on other grounds* Hunter v. Cole, 137 S. Ct. 497 (2016); Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988); Devereaux v. Abbey, 263 F.3d 1070, 1075 (9th Cir. 2001); Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313 (11th Cir. 2015).

This Court has recognized a fabrication of evidence claim based on the District of Columbia analogue to the 14th Amendment because the rights is based on Supreme Court

decision that anchors the right in the 14th Amendment. <u>Gates</u>, 66 F. Supp. 3d at 25 *citing* <u>Miller v. Pate</u>, 386 U.S. 1, 7, (1967) ("More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence.") and <u>Mooney v. Holohan</u>, 294 U.S. 103 (1935).

> **2. The due process clause protects the right to be free from evidence that is fabricated by state actors and a stand-alone claim for fabrication of evidence is independent of a Fourth Amendment malicious prosecution claim.**

The due process clause protects the right to be free from evidence that is fabricated by state actors and a stand-alone claim for fabrication of evidence is independent of a Fourth Amendment malicious prosecution claim.

A fabrication of evidence claim is different from a malicious prosecution claim because probable cause is not an element. <u>Black</u>, 835 F.3d at 369 (rejected the defendants' argument that claims of evidence fabrication must be tied to malicious prosecution cases); <u>Cole</u>, 802 F.3d at 766 (explaining difference between 4th Amendment <u>Albright</u>[4] malicious prosecution claim and stand-alone fabrication claim based on due process); <u>Garnett v. Undercover Officer C0039</u>, 838 F.3d 265, 278 (2d Cir. 2016) (whether or not probable cause existed for an arrest is irrelevant to the claim); <u>Ricciuti</u>, 124 F.3d at 129-30 (rejecting an argument that "so long as there was probable cause for Alfred Ricciuti's arrest - independent of the allegedly fabricated evidence - the fabrication of evidence is legally irrelevant").

> **D. Officer Onoja's fabrication of the evidence caused Mr. Junes' deprivation of liberty.**

The defendants contend that even if Officer Onoja caused the prosecution and loss of liberty of Mr. Junes by fabricating facts about the APO and transmitting them to the prosecutor in the papering process he escapes liability on the fabricating claim because Mr. Junes was charged

---

[4] <u>Albright v. Oliver</u>, 510 U.S. 266, 268 (1994).

with three other offenses and so he cannot show that the fabricated APO charge was the "but for" cause of the prosecution.

This argument fails for several reasons. First, as with a malicious prosecution claim, the charges should be evaluated on a per charge basis. Officer Onoja caused the prosecution and loss of liberty of Mr. Junes by fabricating facts about the APO and transmitting them to the prosecutor in the papering process, and he is liable to Mr. Junes for the damages he suffered thereby.

A conviction on one claim does not necessarily absolve liability under 42 U.S.C.S. § 1983 for malicious prosecution as to other criminal charges which were resolved favorably to a plaintiff. *See e.g.*, Janetka v. Dabe, 892 F.2d 187, 190 (2d Cir. 1989); Posr v. Doherty, 944 F.2d 91, 100-101 (2d Cir. 1991)(where defendant was charged and convicted of one offense and charged but acquitted of a second offense, and he sued later for malicious prosecution, the unfavorable termination on the one charge does not preclude a finding of liability for maliciously prosecuting the other charge); Ostroski v. Town of Southold, 443 F. Supp. 2d 325, 330 (E.D.N.Y. 2006). A similar rule applies here because facing two charges is a greater deprivation of liberty than one. For example, where there are two charges a prosecutor can use the risk of conviction on two charges as a bargaining chip to get a plea on one charge.

Second, Officer Onoja fabricated facts (including omitting relevant facts) and he communicated them to the prosecutor in the arrest packet via paperless papering not only for the APO, but also for the POCA charge, and the "K-2" charge, and the "switchblade" charge as well.

In this case, the magnitude of Officer Onoja's fabrications (including omitting relevant facts) corrupted the entire prosecution.

In constitutional-tort cases as in other cases, "a man [is] responsible for the natural consequences of his actions." Jones v. Chicago, 856 F.2d 985, 993 (7th Cir. 1988).

According to defendants' own authority,

> We have consistently held that a police officer who manufactures false evidence
> against a criminal defendant violates due process if that evidence is later used to
> deprive the defendant of her liberty in some way. In Jones v. City of Chicago, we
> upheld a jury's imposition of damages against a variety of defendants, including
> police officers and a crime lab technician, who "were determined to put away
> George Jones regardless of the evidence."

Whitlock v. Brueggemann, 682 F.3d 567, 580 (7th Cir. 2012).

Officer Onoja was "instrumental in the plaintiff's continued confinement or prosecution."

Jones v. Chicago, 856 F.2d 985, 994 (7th Cir. 1988).

The facts in the record clearly show that Officer Onoja was "determined to put away [Mr.

Junes] regardless of the evidence" on these charges to escape liability for his own misconduct, and

he clearly meets the deprived Mr. Junes of his liberty "in some way." Whitlock v. Brueggemann,

682 F.3d 567, 580 (7th Cir. 2012).

> As the Second Circuit pointed out,
>
> The setting of [conditions of release], which may make the difference between
> freedom and confinement pending trial, and the prosecutor's decision to pursue
> charges rather than to dismiss the complaint without further action, may depend on
> the prosecutor's and magistrate's assessments of the strength of the case, which in
> turn may be critically influenced by fabricated evidence. Thus, a further deprivation
> of liberty can result from the fabrication of evidence even if the initial arrest is
> lawful [because based on probable cause].

Garnett v. Undercover Officer C0039, 838 F.3d 265, 277 (2d Cir. 2016).

First, Officer Onoja arrested Mr. Junes without probable cause and then he pepper-

sprayed him without justification. Subsequently, realizing his misconduct could get him in trouble,

he started pumping up the facts of the seizure to make his conduct seems more reasonable – the

50 year old Mr. Junes became a trained killer, Officer Onoja knew the Gatorade bottle had

alcohol in it because he had seen Mr. Junes drinking beer out of it earlier in the day, a little bit of

weed became the dangerous synthetic cannabinoid K-2, an OTF (out the front) knife carried for

self-defense consistent with the 2d Amendment became a dangerous switchblade. A further

deprivation of liberty resulted from the fabrication of evidence even if some of the charges were based on probable cause. Likely the U.S. Attorney would not have papered the cases in the absence of fabricated facts pumping up the charges and Mr. Junes would not have been ordered to stay away from his kith and kin in his neighborhood gathering spots. <u>Garnett</u>, 838 F.3d at 277 ; Ps. Ex. # 3.

## II.   Defendants' Motion For Summary Judgment On Mr. Junes' Excessive Force And Assault And Battery Claims Should Be Denied Because Officer Onoja Is Not Entitled To Qualified Immunity Or A Common Law Privilege.

The Court should deny Defendant's Motion for Summary Judgment on Mr. Junes' excessive force and assault and battery claim for three reasons. First, Officer Onoja is not entitled to qualified immunity on Mr. Junes' 4th Amendment Excessive Force Claim. Second, Officer Onoja is not entitled to any common law defenses on Mr. Junes' assault claim. Finally, Mr. Junes is not required to provide expert testimony on the issue of Officer Onoja use of force or any other issue.

Officer Onoja had no reasonable suspicion or probable cause to believe that Mr. Junes committed the offense of POCA or any other offense. *Id.* Mr. Junes did not pose a danger to Officer Onoja or anyone else. Plaintiff's Opposition to SMF ¶ 8. He never "actively resisted" or tried to flee "to evade arrest by flight." <u>Graham</u>, 490 U.S. at 396. Plaintiff's Opposition to SMF ¶ 8.

### A.   Officer Onoja is Not Entitled to Qualified Immunity on Mr. Junes' 4th Amendment Excessive Force Claim.

An officer's act of violence violates the Fourth Amendment if it furthers no governmental interest such as apprehending a suspect pursuant to a valid arrest or protecting an officer or the public. <u>Johnson v. District of Columbia</u>, 528 F.3d 969, 976 (2008). Even in excessive force cases where officers have prevailed, our Circuit has always emphasized that the violence complained of

was undertaken in pursuit of a legitimate end. *See* <u>Scott v. District of Columbia</u>, 101 F.3d 748, 760 (D.C. Cir. 1996).

For example, in <u>Scott v. District of Columbia</u>, on which the District's relies, although the Circuit found no Fourth Amendment violation where officers struck a suspect once and pinned him to the ground, because "[a]ll of the officers' actions were reasonably calculated toward the goal of securing [the suspect] and placing him in handcuffs, while minimizing his opportunity to escape," the Court was careful to emphasize that "Nothing in the record indicates that they used more force than reasonably appeared necessary to achieve that goal." 101 F.3d 748, 760 (D.C. Cir. 1996).

Here, Officer Onoja had no legitimate end and no need to use force against Mr. Junes.

1.  **The violence Officer Onoja used against Mr. Junes was, under Mr. Junes' version of events, gratuitous because Mr. Junes had done nothing wrong as far as Officer Onoja knew.**

Use of force against a person who has done nothing wrong is gratuitous because there is no legitimate purpose to sustain it. <u>Mazloum v. D.C. Metro. Police Dep't</u>, 522 F. Supp. 2d 24, 34-35 (D.D.C. 2007) *citing* <u>Scott</u>, 127 S. Ct. at 1778 (holding that it is "appropriate . . . to take into account . . . [the] relative culpability" of a plaintiff in resolving an excessive force claim); <u>Westfahl v. D.C.</u>, 2015 U.S. Dist. LEXIS 149847, *19.

In determining whether a police officer used violence in pursuit of a legitimate end a court must consider several factors, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989); <u>Mazloum v. D.C. Metro. Police Dep't</u>, 522 F. Supp. 2d 24, 33 (D.D.C. 2007).

Officer Onoja scores a zero on the <u>Graham</u> factors. The <u>Graham</u> factors are applied "in light of the facts and circumstances confronting" the officers, so facts unknown to them carry no weight. <u>Mazloum v. D.C. Metro. Police Dep't</u>, 522 F. Supp. 2d 24, 33 (D.D.C. 2007). So, Mr. Junes' honest concession that the Gatorade bottle had wine cooler in it is not imputed to Officer Onoja for the purpose of determining whether he had probable cause to make the stop.

Similarly, whether reasonable suspicion or probable cause existed is determined on the basis of facts known to the officer at the time, and not after acquired facts. The Fourth Amendment "objective" probable cause test is based entirely on the objective facts as they existed before and at the time of the arrest **as they were known to the officer**. <u>Devenpeck v. Alford</u>, 543 U.S. 146, 152-153 (U.S. 2004).

The same rule applies to the common law false arrest claims. <u>District of Columbia v. Murphy</u>, 631 A.2d 34 (D.C. 1993) *reaffirmed on rehearing at* <u>District of Columbia v. Murphy</u>, 635 A.2d 929, 930 (D.C. 1993). Facts that an arresting officer actually knew at the time of arrest must be attributed to the officer making an arrest for the probable cause analysis even though the Fourth Amendment and the common law probable cause analysis is an objective analysis because such facts are facts "known to the officers at the time of the arrest" and they are thus relevant to the issue of probable cause to arrest. <u>Littlepage v. Quigley</u>, 69 F. Supp. 3d 136, 2014 U.S. Dist. LEXIS 134244, *7, n. 4 (D.D.C. 2014).

But, in this test the Court does not consider "what a police officer may have actually, even reasonably, *perceived* the facts to be." <u>Scales</u>, at 729 (emphasis added). This test, therefore, is dependent entirely on the facts as they actually occurred -- *i.e.,* on the objective facts -- without regard to what a police officer may have actually, even reasonably, perceived the facts to be. <u>Murphy</u>, 635 A.2d at 932. Finally, the existence of a controverted, material fact precludes finding the existence of probable cause as a matter of law. <u>Murphy</u>, 635 A.2d at 930.

**2.  Officer Onoja had no reasonable suspicion or probable cause to believe that Mr. Junes had committed the offense of POCA or any other offense.**

The violence Officer Onoja used against Mr. Junes was, under Mr. Junes' version of events, gratuitous because Mr. Junes had done nothing wrong as far as Officer Onoja knew, or any wrongdoing was a minor, non-violent POCA offense which did not indicate dangerousness. Westfahl, 2015 U.S. Dist. LEXIS 149847, *19 citing Morton v. Kirkwood, 707 F.3d 1276, 1281-82 (11th Cir. 2013) (finding use of force excessive when the officer had no reason to believe that the plaintiff had committed any crime or posed any threat); Mazloum, 522 F. Supp. 2d at 33.

As to the first Graham factor, Officer Onoja had no reasonable suspicion or probable cause to believe that Mr. Junes committed the offense of POCA or any other offense. *Id.* But, at the end of the day, even if Officer Onoja did have probable cause to arrest Mr. Junes for POCA, the offense of POCA still counts for zero in the Graham analysis because carrying an open container of alcohol in a prohibited area does not suggest that the suspect poses an immediate threat to the safety of the officers or others.

Officer Onoja contends that he stopped Mr. Junes in the alley because he knew that the bottle on his bike bottle holder was an open container of alcohol. At most, Officer Onoja saw that Mr. Junes had a clear plastic bottle with some liquid in it in the bottle holder on his bicycle.





But, looking at the start of the video as Officer Onoja approached, given where Mr. Junes was standing, it is not even obvious that Officer Onoja could see the bottle on the bike. Officer Onoja may have had a "hunch" that the liquid in the bottle was beer or wine because the liquid seems to have a head on it but that hunch does not rise to the level of reasonable suspicion let alone probable cause. Many non-alcoholic beverages are carbonated and Mr. Junes may have added one to the Gatorade.

Moreover, an examination of the bottle in the dark and in the light shows that it looks like Gatorade.



https://www.google.com.hk/search?q=GatorAde&source=lnms&tbm=isch&sa=X&ved=0ahUKEwjtq_WUkK3aAhVFw7wKHfz0DtoQ_AUICigB&biw=960&bih=474



It appears that adding a Bud Light Lime would have darkened the color beyond the color of the liquid in Mr. Junes' Gatorade bottle.

https://www.google.com.hk/search?q=bud+light+lime+beer&source=lnms&tbm=isch&sa=X&ved=0ahUKEwiP-q2Ana3aAhVHyrwKHTuRBiQQ_AUICigB&biw=960&bih=474#imgrc=sTZe-hzuWSyrDM:

Mr. Junes never admitted to Officer Onoja that the liquid in the bottle was alcohol. Mr. Junes was not acting intoxicated when Officer Onoja encountered him. Junes depo, p. 195. The

statement in the arrest report that earlier in the day Officer Onoja saw Mr. Junes in front of Rose's Liquor Store drinking a yellowish and foamy beverage known to be Budlight Lime beer out of a Gatorade bottle, and that Mr. Junes poured it out when officer Onoja told him to must be excluded from the probable cause facts for the reasons explained above. *See e.g.*, Franks v. Delaware, 438 U.S. 154, 171-72 (1978) (false statements in a warrant cannot be considered in the probable cause analysis).

      Anyway, Officer Onoja does not say why in the previous encounter he believed the liquid in the bottle was beer. He does not describe smelling it. Construing inferences in favor of Mr. Junes, in light of Officer Onoja's treatment of Mr. Junes, it is reasonable to believe that Mr. Junes poured out the liquid simply because he was afraid of Officer Onoja, not because it was beer.

      Moreover, in the alley incident, Officer Onoja never smelt the liquid until after he knocked Mr. Junes to the street. Onoja depo, p. 130. Nor did he smell any alcohol on motion for summary judgment' breath when he stopped him. *Id.*; Defendants' Ex. D, start to 01:30.

      Nor do these facts establish probable cause for any other offense.

      Mr. Junes walked away but he was under no obligation to stay. Refusing to comply with Officer Onoja's order to stay is not a violation of the law unless the order was a lawful order. In the absence of probable cause that the Gatorade bottle had alcohol in it, the order was not lawful. Streit v. District of Columbia, 26 A.3d 315, 319 (D.C. 2011)(lawfulness of the order is an element of the offense of failure to obey a lawful order of a police officer); DCMR § 18-2002.

      Walking away is not "resisting" under the APO statute. Coghill v. United States, 982 A.2d 802, 807 (D.C. 2009)(flight is not evidence of active resistance sufficient to violate the APO statute). Nor is saying, "don't put your hands on me" while trundling your bicycle away active resistance. *Id.*

Moreover, Mr. Junes does not move his arm to shield his eyes from the mace until after Officer Onoja maced him so the arm movement was not the reason Officer Onoja maced him. Officer Onoja tugged on Mr. Junes coat and then he waited for him to turn his head towards him and then sprayed him with mace. Junes depo, p. 98; 9-14; Junes depo, p. 100; 15-22; Junes depo, p. 101; 1-14. A reflex action does not rise to the level of resisting to sustain an assault conviction. Ruffin v. United States, 76 A.3d 845, 851 (D.C. 2013). Nor does an accidental touching of the person of another constitute an assault. Carter v. United States, 531 A.2d 956, 959 n.6 (D.C. 1987).

To the extent that Officer Onoja contends that Mr. Junes "swatted" at him "off camera" before he maced him Mr. Junes denies it and Mr. Junes' version controls for summary judgment purposes. Junes depo, pp. 127-129.

### 3.   Mr. Junes was not actively resisting arrest or attempting to evade arrest by flight.

Mr. Junes was not actively resisting arrest or "attempting to *evade arrest* by flight." Mazloum, 522 F. Supp. 2d at 33 *citing* Graham, 490 U.S. at 396. As stated above, flight is not active resistance under the District of Columbia APO statute. Nor was Mr. Junes "attempting to *evade arrest* by flight." Mr. Junes was not trying to run away from Officer Onoja, he was just trying to come out of the alley to talk where it was well lighted and full of people. Junes depo, p. 104: 6-18. Once Officer Onoja started squirting pepper-spray in his eyes his instinct for self-preservation took over and he was attempting to *evade the pepper spray.*

Officer Onoja tries to have it both ways on this point: he says he had reason to fear Mr. Junes because of his training, yet he does not want Mr. Junes to move from a lonely dark alley into a bustling, well-lit street.

### 4.   Mr. Junes did not pose a danger to Officer Onoja or to anyone else.

As explained above, Mr. Junes is not Jason Bourne, he's Mr. Bojangles.

Moreover, as explained above, Officer Onoja obviously did not think that Mr. Junes posed a danger to him because of a knife or his Army training because Officer Onoja leapt right out of his car in a deserted dark alley without calling for back up all because he claims he thought Mr. Junes had a bottle containing beer in his bicycle cup holder. Officer Onoja's contention that Mr. Junes presented a threat because of his military training is a recent fabrication because he does not mention it when he recounted the events to his colleagues. BWC, *passim*.

Under Mr. Junes' version of events, Officer Onoja maced the 50-year-old Mr. Junes and threw him to the street simply because he refused to stay in an dark alley at night alone with Officer Onoja though, as he explained, he was willing to talk with him in the well-lighted, well populated street at the end of the alley, Junes depo, p. 104: 6-18, and to establish dominance over him and others like him, and to serve the gentrification efforts of the City and the developers who are gentrifying the area.

The video shows the dark, lonely alley where Officer Onoja encountered Mr. Junes. BWC Video, Defendant's Ex. D. In contrast, it also shows the well-lighted street at the end of the alley fronted by a busy, well-lighted 7-11.

> **5.  The use of force was not objectively reasonable because there was no legitimate police purpose to sustain it.**

Officer Onoja's use of violence was not undertaken in pursuit of a legitimate police purpose. *See* Scott v. District of Columbia, 101 F.3d 748, 760 (D.C. Cir. 1996).

In reviewing the second prong of the qualified immunity analysis – whether a reasonable officer could have believed his or her actions were lawful – a court may consider such factors as an officer's biases against the arrestee or their motives, e.g., demonstrating his dominance. Simpson v. City of N.Y., 793 F.3d 259, 268-60 (2d Cir. 2015). Drawing inferences in favor of Mr. Junes, and the absence of probable cause and any other justification for the use of force, the use of force was

in furtherance of Officer Onoja's desire to express dominance, Officer Onoja's desire to clear the area and to teach Mr. Junes a lesson about drinking in public, Officer Onoja's and the District's practice of clearing long term residents from the public spaces for the benefits of merchants, developers, and gentrification. Ps. Ex. # 2, Detective Marlow Video; OPC Report on use of the Blocking Passage Law,

https://policecomplaints.dc.gov/sites/default/files/dc/sites/office%20of%20police%20complaints/publication/attachments/Blocking%20Passage%20Report.FINAL_.pdf.

Officer Onoja frequently tells Mr. Junes and other people on his beat that it is his neighborhood now. Junes depo, p. 36: 7-21(in front of Mr. Junes and four friends Officer Onoja said, "Y'all know this is my neighborhood around here now."); *Id.* at 61-62 (heard Onoja say more than once that this is his neighborhood).

Officer Onoja has personal animus against Mr. Junes. All of his arrests in the last ten years have involved Officer Onoja. Plaintiff's Opposition to defendants' SMF # 2; Junes depo, p. 64. Officer Onoja has arrested Mr. Junes several times and each time the case has been *nolle*'d by the prosecutor. 16 CMD 666 (the prosecution on which this case is based) *nolle*'d; 16 CMD 1757 – *nolle*'d; 2016 CMD 006517 – *nolle*'d.

The video of Detective Marlow's lecture to Mr. Junes at the station house establishes Officer Onoja's desire to clear the area of "people like him" and to teach Mr. Junes a lesson about drinking in public, and Officer Onoja's and the District's practice of clearing long term residents from the public spaces for the benefits of merchants, developers, and gentrification. Ps. Ex. # 2, Detective Marlow Video.

<u>Simpson</u>, 793 F.3d at 269 ("Add to this scenario the reasonable inference that Officer Nelson (1) was upset by having been rebuffed and (2) was merely demonstrating his dominance, and any pretense of reasonableness flies out the window.").

Moreover, neither a subjective mistaken perception by Officer Onoja that Mr. Junes

"swatted," Defendants' Ex. D, or "made a striking motion towards him," defendants' SMF 21,  nor

a subjective mistaken perception by Officer Onoja that the Gatorade bottle looked like it

contained alcohol entitle Officer Onoja to qualified immunity.

> Although qualified immunity must be determined from the perspective of a
> reasonable officer "possessing the same knowledge as the officer in question,"
> Defendants' argument would collapse the distinction between an objective and a
> subjective inquiry, essentially allowing one to infer objective reasonableness from
> sincere subjective belief. Yet the Supreme Court has cautioned that "an arresting
> officer's state of mind (except for the facts that he knows) is irrelevant to the
> existence of probable cause." Defendants attempt to turn the officers' belief that
> Plaintiff had his feet on the seats into a fact: that the officers saw Plaintiff's feet on
> the seats.
> Yet a mistaken subjective belief is not a fact relevant to the objective existence of
> probable cause; to say otherwise, or to say that finding a sincere subjective belief in
> X is inconsistent with finding a perception of X to be objectively unreasonable,
> would be to transform the probable cause inquiry from an objective one into a
> subjective one.

Rucks v. City of N.Y., 96 F. Supp. 3d 138, 152 (S.D.N.Y. 2015)(internal citations omitted).

### B.   Officer Onoja is not entitled to any common law defenses on the assault claim.

A police officer is liable for battery when they commit an "intentional act that causes

harmful or offensive bodily contact" and when the officer's use of such force was "in excess of that

which the actor reasonably believes to be necessary." Hall, 867 F.3d 138 *46-47. "[T]he officer

must subjectively believe that he or she used no more force than necessary, but the officer's

judgment is [also] compared to that of a hypothetical reasonable police officer placed in the same

situation." Id. *citing* Scales v. District of Columbia, 973 A.2d 722, 730 (D.C. 2009).

It is undisputed that Officer Onoja assaulted and battered Mr. Junes when he pepper-

sprayed him and slammed him to the ground. *See* Etheredge v. District of Columbia, 635 A.2d

908, 916 (D.C. 1993). Defendants concede this point they contend only that the assault and battery

was privileged.

Under common law assault a police officer has a qualified privilege to use reasonable force to affect an arrest, but only if the means employed are not "in excess of those which the actor reasonably believes to be necessary." Etheredge v. District of Columbia, 635 A.2d 908, 916 (D.C. 1993).

Officer Onoja has no privilege for the force he used because there was no probable cause that Mr. Junes had committed an offense in Officer Onoja's presence. Hall, 867 F.3d 138 *46-47.

Alternatively, if there were probable cause, the means employed was "in excess of those which the actor reasonably believes to be necessary" because all of the Graham factors zero out because the offense was minor, Mr. Junes is not dangerous, and he was just trying to get out of the alley, not evade arrest. Etheredge v. District of Columbia, 635 A.2d 908, 916 (D.C. 1993). The alleged offense was minor and Mr. Junes never resisted or posed a threat to Officer Onoja's safety or to the safety of any bystanders, or attempted to flee the scene. Hall, 867 F.3d 138 *46-47.

Therefore, the violence was not in furtherance of a police objective, so it was not reasonable. Hall, 867 F.3d 138 *39.

Conversely, drawing the reasonable inferences in favor of Mr. Junes, and the absence of probable cause and any justification for the use of force, the use of force was in furtherance of Officer Onoja's desire to express dominance and his personal animus towards Mr. Junes, Officer Onoja's desire to clear the area, Officer Onoja's and the District's practice of keeping clearing long term residents from the public spaces for the benefits of merchants, developers, and gentrification. Simpson v. City of N.Y., 793 F.3d 259, 268-60(in reviewing the second prong of the qualified immunity analysis – whether a reasonable officer could have believed his or her actions were lawful – a court may consider such factors as an officer's biases against the arrestee or their motives, e.g., demonstrating his dominance). Mr. Junes' evidence on the assault and battery claim is sufficient to

require its submission to a jury and to preclude entry of summary judgment. <u>Etheredge v. District of Columbia</u>, 635 A.2d 908, 917 (D.C. 1993).

### C.  There was no need for expert opinion testimony on the so-called "tactical takedown" or any other issue.

There was no need for expert opinion testimony on Officer Onoja's use of violence against Mr. Junes. Plaintiff's Opposition to defendants' SMF ¶ 11.

There is no rule in this Circuit or any other Circuit that imposes a *per se* requirement of expert testimony in excessive force and assault/battery cases involving a police officer. This Court does not require the use of expert opinion testimony in cases such as this one when the knowledge is within the ken of a layperson.

There was no need for expert opinion testimony in this case because the means of the force was pushing Mr. Junes down on the ground and spraying pepper spray in his eyes and that is within the knowledge of the average layperson. "Where force is reduced to its most primitive form—the bare hands—expert testimony might not be helpful." <u>Kopf v. Skyrm</u>, 993 F.2d 374, 378 (4th Cir.1993). In <u>Kopf</u>, 993 F.2d at 376, 378, a federal district court "ruled in limine that two expert witnesses [the plaintiff] expected to call" to testify regarding the use of police dogs and slapjacks "would not be permitted to testify" because "the excessive force standard—'objective reasonableness'—is comprehensible to a lay juror and ... expert testimony would therefore not assist the trier of fact."

Officer Onoja's use of pepper spray did not even merit a use of force report.

As the second Circuit held in <u>Brown</u>, the "assessment of a jury is needed in this case." <u>Brown v. City of N.Y.</u>, 798 F.3d 94, 103. The Court continued, the uncertainty "leaves the factual determination of excessiveness to a jury, whose collective common sense, informed by their life experiences, may well exceed that of all the members of this panel." Id.

Thompson v. City of Chicago, 472 F.3d 444 (7th Cir.2006) is another example of a case in which expert testimony on the use of force was deemed not admissible. In Thompson, a police officer involved in subduing a suspect who had led officers on a high-speed automobile pursuit employed a chokehold while other officers handcuffed the suspect. (Id. at pp. 447–448.) The suspect died as a result of asphyxia due to the chokehold. (Id. at p. 448.).

Recently the Seventh Circuit stated,

> Expert testimony about police standards may appropriately assist the jury in resolving some excessive-force questions, but sometimes evidence of this type is unhelpful and thus irrelevant, particularly when no specialized knowledge is needed to determine whether the officer's conduct was objectively unreasonable. The misconduct alleged here was easily within the grasp of a lay jury, so the judge did not abuse her discretion in excluding the expert.

United States v. Brown, No. 16-1603, 2017 U.S. App. LEXIS 17403, at *2 (7th Cir. Sep. 8, 2017).

The case defendants cite to was a 1991 District of Columbia Court of Appeals case which used the Frye standard instead of FRE 702 and the Daubert standard. The District of Columbia Court of Appeals did not adopt the Daubert standard until this year. Motorola Inc. v. Murray, 147 A.3d 751, 754 (D.C. 2016) (District of Columbia Court of Appeals adopts FRE 702; when a party proffers expert scientific testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.").

Finally, Mr. Junes does not allege negligence so he does not need an expert to establish the standard of care. Dormu v. District of Columbia, 795 F. Supp. 2d 7, 29 (D.D.C. 2011).

Accordingly, Officer Onoja is not entitled to qualified immunity on Mr. Junes' excessive force and assault and battery claims. He does not qualify for any defenses under common law. Respectfully submitted,

/s/William Claiborne
**WILLIAM CLAIBORNE**
D.C. Bar # 446579

Counsel for Plaintiff
ClaiborneLaw
717 D Street, N.W., Ste 300
Washington, DC 20004
Phone 202/824-0700
Email claibornelaw@gmail.com

/s/Joseph Scrofano
**JOSEPH SCROFANO**
D.C. Bar # 994083

*Counsel for Plaintiff*
Scrofano Law PC
406 5th Street NW, Suite 100
Washington, DC 20001
Phone  (202) 870-0889